I will proceed with Case No. 19-2313, Alphonso Inc. v. Free Stream Media Corp. Mr. Chatterjee. Good morning, Your Honors. May it please the Court. This is Neil Chatterjee, as Your Honor said, and I represent the appellant, Alphonso. The District Court was wrong to say that the 755 patent violated Section 101 merely because it engaged in a mathematical operation, namely what the patent describes as a lift metric. The patent does considerably more than that. What the District Court failed to do is that it ignored the fact that the 755 patent actually claimed how to obtain specific types of data needed from two different sets of content, how to make sure you have the right data using a technical technique it described as a matching engine, and then it provided a specific way to calculate the lift metric using that data. The Supreme Court in Diamond v. Deere, as well as this Court on numerous occasions, including the Collis case, have repeatedly held that a mathematical formula can be patentable when someone isn't seeking to prevent all uses of the formula, but instead when you're talking about a specific type of application, and particularly one such as here where it's rooted in a technical problem. For those reasons, we ask that this Court reverse the District Court's decision. Mr. Chatterjee, this is Judge Stoll. I'm sorry to jump in so quickly, but I think you know where you're going, but I think looking at Claim 1, one problem I'm having is I think we need to know what exactly is the alleged technical problem that came with automating the calculation of the lift metric, and more so how is that specifically claimed, the solution to that technical problem, that technical solution to that technical problem, how is it specifically claimed in Claim 1? Thank you, Your Honor. The answer to that is fairly straightforward here. This Court recently decided a case called Packet Intelligence, which was 955-1299. And the way that this Court described the technical problem, which is the same one here, is the fact that network-based communications are disjointed. That was the word that this Court used. And by disjointed, you have an advertisement, a digital advertisement, that is sent at a different time from the time that an audiovisual communication is sent over a network. And the problem with that is that the devices may actually, or these two pieces of content will arrive at devices at different times through a network-based communication, and you don't necessarily know how to tie the two together. So what the patent describes is it describes two pieces of a technical solution. The first thing you do is you need to identify for each one of these two disjointed communications what devices they actually went to. But then the patent describes that that's not enough. What the patent says is because this is a disjointed communication, you don't know if the advertisement arrived at the audiovisual device before or after the audiovisual communication. And so what the patent says is it says you have to eliminate the instances where the advertisement arrived before the audiovisual content. And the patent actually describes, the specification describes, as that being a specific thing that you need to look out for, because what the patent specification is doing is it says one of ordinary skill in the art may not know it has to filter out this information of an advertisement reaching beforehand. And so the patent teaches that you actually have to get rid of the advertisements that reach ahead of time and instead focus only on when, I'm sorry, the audiovisual communication. You have to make sure that the lift is only being measured if the ad was delivered first. And that's the technical solution, and it's really one that's reflected in computer networking problems, Your Honor. Can you direct us to the claim language that you're relying on? Yes, I can. There were two different questions, Your Honor. Perhaps I can answer Judge Stoll's question first. Yes, that was my question as well. In the claim language, Your Honor, as far as the audiovisual devices and the digital ads, those are claim elements 1A, and then there's 1A1 through 1A3, and then 1B123. And then if you look at the claim language in the lift metric, which is claim element D sub 1, it specifically talks about that the way you're calculating the lift metric is associated with audiovisual devices that played the audiovisual content associated with the digital ad after the digital ad was delivered. Judge Lynn, did you have another question? I'm sorry, I didn't mean to jump the gun there. No, no. That was the question, and that was what I was looking for. Thank you. Thank you, Your Honor. And if I can, I would also like to point to the area of the specification where they identify this specific problem. The portion of the specification where they identify this specific problem is in column 5, lines 14 through 18, as well as column 6, lines 51 to 57. This networking problem is really what is at the core of why this is an inventive technology, and we described this at the district court. Now, the way that the patent describes it, returning to Alice's step one, is that it really talks about creating a database structure, two separate ones, one for the audiovisual communication and one for the advertisement. And both of these digital advertisements are actually monitored through what the patent describes as a monitored audiovisual device, which is defined in the specification at column 2, line 29 through 31. And these monitored audiovisual devices will collect a whole variety of data, but the patent says look at three specific units of data. One of them is what is the content that was delivered. The second is what is the device that it was delivered to. And the third one, and this one is the particularly critical one we were just talking about, is to know the time of the delivery, because that time of delivery is what addresses this disjointed communication. In the responsive brief, the red brief. The time of delivery of the program versus the time of the delivery of the ad. Is that correct? I'm sorry, Your Honor. You were very, very faint when you said something, so I didn't hear what you said. Try again, Judge Stone. We're not hearing you. Sorry about that. I apologize. What I was trying to say was, so I understand correctly, Mr. Chatterjee, that the key to the invention is the difference in the time for the program content versus the time for the digital ad. Right? Yes, Your Honor. Comparing those times. Yeah. That certainly is an important part. The fact that there's this matching server, Your Honor, that also marries together these two disjointed communications, is an important component because it solves a network problem. So that's the unique identifier, right? Or is it the unique identifier or the identification of the device? Your Honor, so I would say that there are two critical aspects of this invention. One is the one that we talked about, which is the time stamp that attaches under Section 1, the claim element 1A3 and 1B3. But then in element 1C, there is a matching server that actually ties the two together. So it says, this audio-visual communication and this ad were delivered to the same device. And then in 1D, they eliminate those timing elements where the digital ad was received after the audio-visual program was watched. Okay. Thank you. Now, what the respondent does here is they actually get a brick-and-mortar example of coupons being given at a grocery store. But in many ways, the example they provide proves too much because they don't talk anything about network communications. If I'm handing out advertisements before someone goes into a store and someone makes a purchase, there's no question that it happened before someone went into the store. But in network-based communications, that isn't the case. Information is sent across networks in a disjointed or asynchronous way, and you have to have a technical way to actually make an evaluation. Two other cases here are particularly relevant, the SRI and the ANDOX case. Both of those are actually discussed in the recent packet intelligence case. And in both those cases, you're dealing with the same sort of problems that are inherent in computer networking situations. The case that the respondent relies on primarily is an SAP case. But the SAP case is not applicable here because in both the SAP case and that line, which includes the electric power group case, those really don't specify the particular types of information you need to look at. They don't talk anything about how do you evaluate and determine whether they're a false positive and how do you address them with your technical solution. And for those reasons, the case that the district court relied upon primarily, which is the SAP case, is not applicable here. Turning briefly to ALICE Step 2, Your Honors, this is, again, an ordered combination. We've already had a dialogue about how each one of these elements of the claim makes a material difference in the structure of solving a problem rooted in computer networks. And one other case that we discussed in our papers, and I'll point Your Honors to, is the TALIS case, which specifically talked about solving problems in new and unexpected ways. I see that I'm just about out of time, Your Honor, unless you have other questions. I'll reserve the remainder of my comments for rebuttal. Okay. Anything else in the panel for the case in chief? No, thank you. Okay, thank you. All right, we'll hear from the other side. Mr. Nelson. Thank you, Your Honor. May it please the court, this is William Nelson on behalf of Freestream Media, which we refer to as Samba. Your Honors, this court has drawn a hard distinction between claims that are directed to an improvement in a device or a network on the one hand, and to method claims on the other, which themselves merely claim performing an abstract idea that's implemented using computers. The former type of claim can be patent eligible, and this court has found such claims eligible in cases like NPHIS and digital memory. The latter, those that simply recite performing an abstract idea using computer components that are generic, are not patent eligible. And that fundamental distinction eliminates the 755 patent claims under Step 1. Now, you've heard Alfonso today and you've seen in his brief that it has tried to fit the claims of the 755 patent into the category of claims directed to an improvement in computers or networks, but they don't fit at all. The claims are not directed to an improved computer or network, but to a purported improvement in an abstract idea in calculating lift, using computers to perform that abstract idea. The claims themselves, and you heard counsel for Alfonso discuss at length the specifications, but really the focus here has to be on what the claims are directed to. And those claims make plain that they're directed to the abstract idea of measuring the effectiveness of an advertisement through steps that are described in the specification as routine, of data gathering, of analysis, and mathematical calculations, implemented on computer components that the specification confirms are generic and conventional. Counsel, what is your specific response to the reliance on the elements like unique identifiers and content identifier and, you know, recording the time of delivery of the ad and the time of delivery of the audio content and comparing those? What is your specific response to that? Is it your position that those are abstract? Is it your position that those are well-known? What is your position? Really, two things, Your Honor. First, the entirety of the computer components and the elements recited in the claim are described and confirmed in the specification as entirely generic. With respect to the first and second databases, the specification first confirms that the present invention may be implemented with any combination of hardware and software. That's at Appendix 146. The first database and the second database are confirmed by the specification to be entirely generic. The specification says that data structures may be stored in any suitable form. Counsel, just let me interrupt you for a second. Let's say that I think that something, if it's a technical improvement, even if it's software, and even if it's on conventional database, it still could be a technical improvement. So why exactly are these claim limitations that I'm referring to, why aren't they a technical improvement? Because they recite and counsel has still identified no improvement to the operation of computers or computer networks rather than an improvement perhaps in the performance of an abstract idea. There is no disclosed improvement in the operation of computers in line with the cases where this court has found claims patent eligible. The unique identifier that is recited in the claims, one learns in the specification, that any unique identifier can be used as long as there is a way to capture it. The content identifier, as described in the specification, is simply identifying a TV show. So its name will do. There is no improvement in the operation of computers disclosed there. Counsel for Alfonso spent a significant amount of time describing why time affects an improvement or the storage of time affects an improvement. It creates no improvement in the operation of computers and computer networks. The relevance of time in the claims is so that the calculation of lift can verify whether or not a viewer of a television program also saw the ad before they viewed that program. Their time must be recorded for both so that the lift calculation can identify only those monitored devices that first saw an ad, then viewed the program because that's essential to the calculation of lift. Nothing that counsel has identified describes any technical improvement whatsoever. There is no how. Counsel referred to the structure of the databases. The claims require no particular structure for the databases that store data. They only recite storing particular kinds of data. There is no improvement in those databases. Again, counsel drew your attention to decisions like packet intelligence, like Amdocs and SRI. The claims found patent eligible in those cases are nothing like the claims of the 755 patent. In each of those cases, the claims themselves, not a few blinds in the specification, but the claims themselves were directed to a specific improvement in the operation of computers and computer networks. There is nothing like that here. For instance, in Amdocs, the claims were themselves directed to an enhanced accounting record that the court, in accordance with the construction provided by the district court, entailed a distributed architecture in which accounting records were processed close to their sources before being transmitted to a centralized manager. There is nothing like that in the 755 claims. There is no improved architecture, no improved computer, and no computer system. Very little, and in fact none, of Alfonso's technical sounding jargon is actually found in the 755 patent claims. In the brief, there is discussion of probabilistic assessments, the system learning over time, device graphs. None of that appears in the claims or is required by the claims. The matching engine of the claim, which counsel for Alfonso said used advanced techniques, is described in the claims simply as performing matching, which the specification confirms is entirely generic and conventional. If there are no further questions on Step 1, I will proceed to Step 2. Okay. I'll proceed. Under Step 2, these claims can be patent eligible only if they recite sufficient additional inventive elements, such that there is somehow something significantly more than an abstract idea here. There is no inventive concept here in these claims. The claims recite only conventional computer equipment performing routine functional steps. There is a server in communication with a couple of databases, and nothing here appears other than conventional hardware, software, and computing techniques well known in the art. Alfonso doesn't appear to dispute that each element of the claims taken alone is conventional. Instead, the position appears to be that the claims are all unconventional taken as an ordered combination. That position is insupportable in light of what the claims actually say and what the specification discloses. The evidence from the claims and specification, both here and before the district court, shows that the 755 patent claims recite only generic computer components operating with respect to each other in conventional ways, in performing routine steps of collecting, storing, and analyzing data in the expected way and in the expected order of operations with each other. Data is collected, it is retrieved, and then a mathematical calculation is performed on it using generic and conventional computer components. None of that provides an inventive concept which can lift these claims into patent eligibility. Alfonso, again, has never explained what is actually unconventional about the recited sequence of operations in the claims, or how those operations, either taken singly or in combination, causes any computer to behave in unexpected ways or causes the functioning of these components to be functioning in any unconventional way, as the claims in cases where this court has found under Step 2 claims are patent eligible. There is nothing in the claims to be found to be true. Finally, with respect to the question of whether there are disputed factual issues that prevent entry of judgment on the pleadings, there are none. There were none before the district court and there are none here as to whether the 755 patent claim elements were anything other than well understood, routine, and conventional. The patent itself raises no fact issue concerning conventionality. The only statement regarding conventionality is made in the specification is that conventional techniques for measuring the effectiveness of such campaigns are inadequate. But that creates no factual issue. It is a mere conclusion. There is nothing in the specification that describes what those conventional techniques were, why they were inadequate, or how the claimed invention addresses those inadequacies, let alone that it addresses them in some unconventional way. Alfonso, before the district court, proposed no claim construction, which would have imported any of the things you heard today, into the claims themselves. The complaint before the district court raises no disputed question of material fact that could preclude judgment against Alfonso at the Rule 12 stage. That complaint alleges only that Samba infringes the claims by collecting and storing information and calculating a lived metric. I wanted just to circle back to one thing I heard from counsel today before I conclude my presentation, and that is the idea that some of the elements of the claim, such as a unique identifier, are a technological solution or somehow an improvement. That is not the case. The specification confirms that unique identifiers, content identifiers, are all generic components of a system that can be used to calculate lives. At Appendix 142, Column 4, the specification tells us that any unique identifier can be used in the context of these claims. There is nothing unconventional there. There is no improvement in the operation of computers or computer networks. There is simply performing the abstract idea using components that this specification confirms are generic. If there are no further questions from the court, I will conclude my presentation. Any more questions for Mr. Nelson from the panel? No, thank you. No, thank you. No, thank you, Mr. Nelson. Mr. Chatterjee? Thank you, Your Honor. I will use my remaining time, unless Your Honor has questions, to address a couple points raised in Mr. Nelson's argument. The first point that Mr. Nelson made, which I have an issue with, is he said that this does not improve the operation of computers in any way and isn't rooted in computer technology. However, this solution addresses a specific problem reflected in computer networking, and one could make the same argument that Mr. Nelson made in the Amdocs case and the GDR case, as well as the packet intelligence case. This court found in each one of those instances that the patent claims involved patentable subject matter. The Amdocs case, which was one of the cases we discussed at length in the lower court, actually deals with collecting information from two disparate locations and then putting it into what it calls an enhanced record. It was that enhanced record that was rooted in networking technology that this court found was patentable subject matter. I wanted to turn briefly back to a question Judge Stoll asked me during my preliminary remarks related to the unique identifier that was also an issue that Mr. Nelson raised. That is indeed an important part of the patent, and the specification actually talks about how one can determine that you're actually identifying the device correctly, and it talks about instances where you might have multiple computers on the same home IP network or the same network where someone were to move to, say, a pre-public Wi-Fi network and how you can do the device identification to identify specific devices. We discussed this in detail at the lower court, that both the unique identifier and the time were important aspects of the convention, and they were rooted in technology. The one last point I'd like to make is this concept of abstractness that Mr. Nelson presented. One way to think about abstractness is whether or not this particular application would preempt all uses in the field. And here it does not. For example, one could calculate a list metric without filtering out the false positives due to time at all. One could do that. It may not give us accurate information, but it certainly would give information. One could also run an ad campaign one week and then not run an ad campaign another week and see how the audio viewership changed between the two weeks. Those are each kind of list metrics one could calculate that wouldn't be covered by the patent at all. So there's no preemption issue here, and that's a good indication that this is not a preempted or abstract claim and instead are talking about highly particularized technical solutions. So with that, Your Honors, I'll submit unless you have further questions. Okay. Any more questions? Mr. Tafferty? No, thank you. No, thank you. Okay. Thank you. Thanks to both counsel. The case is taken under submission.